ST. LOUIS INDEPENDENT PACKING
COMPANY, a Division of Swift &
Company, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 13229.

United States Court of Appeals
Seventh Circuit.

June 21, 1961.

George V. Gallagher, Chicago, Ill., Arthur C. O'Meara, Donald H. Bussman, Chicago, Ill., of counsel, for petitioners.

Ann Leonard, Chicago, Ill., amicus curiæ.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Julius G. Getman, Attorney, Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Melvin J. Welles, Attorney, National Labor Relations Board, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and GRUBB, District Judge.

CASTLE, Circuit Judge.

This case is before the Court on the petition of St. Louis Independent Packing Company, a Division of Swift & Company, pursuant to Section 10(f) of the National Labor Relations Act, as amended, (29 U.S.C.A. § 160(f)) to review and set aside an order of the National Labor Relations Board. The Board, in its answer, requests enforcement of the order.

The Board's decision and order followed proceedings under the Act [1] which culminated in its finding and concluding, in agreement with its trial examiner, that the petitioning company [2] violated Section 8(a) (1) and (2) [3] of the Act by granting unlawful assistance and support to the National Brotherhood of Packinghouse Workers, Local 20 (NBPW). The Board's order requires petitioner to cease and desist from recognizing NBPW as the representative of the production and maintenance employees at its St. Louis, Missouri, plant and from entering into, renewing, giving effect to, or publicizing any negotiations, agreements, or understanding with NBPW respecting the St. Louis plant, unless and until NBPW is duly certified by the Board as the exclusive representative of such employees. And that petitioner cease and desist from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights.[4] Affirmatively, the order directs petitioner to withdraw and withhold all recognition from NBPW as representative of such employees unless and until NBPW is certified by the Board, and to post the usual notices.

The parties each state the contested issues somewhat differently. However, we conceive the main issues presented for our determination to be:

(1) Whether substantial evidence on the record considered as a whole supports the Board's findings and conclusions that

---

1. The National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq. Hereinafter referred to as Act.

2. Hereinafter referred to as petitioner.

3. 29 U.S.C.A. § 158, which, in so far as pertinent, provides:
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *."

4. 29 U.S.C.A. § 157, which provides:
   "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

by negotiating and entering into agreements with NBPW concerning the employees at the St. Louis plant petitioner unlawfully assisted and supported NBPW in violation of Section 8(a) (2) and frustrated Section 7 rights of the employees to self-organization and collective bargaining in violation of Section 8(a) (1).

(2) Whether the Board's order in so far as it requires petitioner to cease recognizing NBPW and giving effect to its agreements with NBPW, unless and until NBPW is certified by the Board, is authorized and proper under the circumstances of the case.

The facts and circumstances upon which the Board's findings and conclusions are based may be summarized as follows:

Petitioner operates meat packing plants located throughout the United States. The production and maintenance employees at some plants are represented by NBPW, at others by Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO (Amalgamated), and at others by United Packinghouse Workers of America, AFL-CIO, (UPWA). Master agreements with each Union cover the units represented by each.

NBPW was certified as representative of the production and maintenance employees in petitioner's St. Louis plant in September 1954. In October 1956 petitioner and NBPW entered into a master collective bargaining agreement covering some 17 bargaining units represented by NBPW, including the St. Louis plant. A simultaneous supplemental agreement provided that should a different labor organization be certified as representative of the employees of any unit covered by the master agreement it would cease and terminate as to such employees. The expiration date of the 1956 master agreement was September 1, 1959. It provided for a dues checkoff upon authorization of the individual employee, subject to revocation at the end of one year, but contained no union security arrangement.

On May 1, 1959, four months prior to the expiration of the master agreement, Amalgamated filed a petition with the Board seeking a representation election at the St. Louis plant. On August 26, 1959, after a hearing, the Board issued a decision directing that an election be held September 23, 1959 to determine whether the employees desired to be represented by NBPW, by Amalgamated, or by neither.

All three of the current master agreements with the three unions were scheduled to terminate September 1, 1959, and in July petitioner had commenced negotiations with all three unions for new master agreements. On August 21, 1959 petitioner and NBPW agreed to continue the current master agreement in effect until the effective date of a new master agreement or until termination of the extension agreement by written notice of either party.

Following the Board's order of August 26, directing the representation election at the St. Louis plant the petitioner and NBPW continued to negotiate, without withdrawing the St. Louis unit from the scope of the negotiations, and in accord with previous company policy petitioner kept the employees at all the affected plants apprised of the progress of negotiations. This was done through a series of identical letters sent to the employees at the various units, each over the signature of the superintendent of the particular plant involved. At least two of the letters sent to the employees at the St. Louis plant were complimentary to NBPW, including one sent two days before the election. One of the letters criticized Amalgamated for its activities in other units.

On September 18, 1959, five days before the election, petitioner and NBPW entered into another agreement, supplementing the August extension, under which the employees covered, including those at the St. Louis plant, were given an increase in wages and other benefits. The September 21 letter to the employees

described this September 18 agreement and stated:

> "You and your Union representatives are to be congratulated on showing such good sense in continuing to work while negotiations continued. This temporary agreement now makes it possible for you to benefit immediately by the items we are putting into effect.

> "We will continue to negotiate to reach an agreement on the open issues and we are hopeful this will come about soon".

On the day before the election the employees were read a statement assuring them that they were free to vote their preference and that the company would bargain with any union that was certified.

At the election 1311 valid ballots were cast, 941 for NBPW, 364 for Amalgamated, and 6 against both. Amalgamated filed objections to the conduct of the election based upon the fact that during the pre-election period petitioner dealt with and publicized its dealings with NBPW. The Board, in a January 18, 1960 decision, reviewing the regional director's report recommending that the objections be sustained, the election be set aside, and a new election be conducted, adopted those recommendations but deferred a new election as a result of this unfair labor practice proceeding.

On October 22, 1959, petitioner and NBPW entered into a new master agreement which included the St. Louis unit. A simultaneous supplemental agreement was executed, identical with that relating to the previous master agreement, providing for withdrawal of any unit for which a different representative should be certified.

Petitioner contends that the Board's order should be set aside because at the time of the bargaining activities complained of NBPW was the incumbent Board certified representative and as such it was the duty of petitioner to bargain with it; that cessation of bargaining activities under the circumstances would not serve the policy of the Act to promote stability in industrial relations; that the record considered as a whole does not support a conclusion that the bargaining activities constituted such support or assistance to NBPW and interference with the employees' protected rights as violate the Act; and that because Amalgamated did not file unfair labor practice charges *before* the representation election and afterwards successfully challenged the election and caused it to be set aside on account of the conduct complained of, sound administrative practice precludes it from pressing the instant unfair labor practice charges and precludes the Board from enforcing the remedy it fashioned.

Although some negotiating activity and an extension of the existing agreement between the petitioner and NBPW occurred between the time a petition for representation was filed and the date the Board, after its investigation, ordered a representation election, the Board's concession in its brief that it "regards the existence of a real question concerning representation as a prerequisite to the application of the Midwest Piping [5] rule"

---

5. Midwest Piping & Supply Co., Inc., 63 NLRB 1060 enunciates the doctrine that execution of a bargaining contract with 1 of 2 or more rival unions, making conflicting representation claims constitutes interference with the Board's function of resolving the representation question and also a breach of the employer's obligation to remain neutral. Neither union involved was an incumbent certified union. In William D. Gibson Co., 110 NLRB 660 (1954) the Board held that the Midwest Piping doctrine is not applicable to situations where an employer contracts with a labor organization which is an incumbent union actively representing the employer's employees. In Shea Chemical Corporation, 121 NLRB 1027 (1958) the Board overruled Gibson and held that upon the presentation of a rival or conflicting claim which "raises a real question" concerning representation, an employer may not go so far as to bargain collectively with the incumbent (or any other) union unless and until the question concerning representation has been settled by the Board.

obviates, on the facts and circumstances disclosed by the record before us, that we consider petitioner's conduct preceding the date of the representation election order as being in issue. The record before us discloses nothing to make petitioner aware that a "real question" of representation existed until the Board ordered an election. The fact that Amalgamated petitioned for representation does not in and of itself raise a real question of representation. It merely shows that Amalgamated asserted a claim to majority representation.

■■ It is not disputed that subsequent to the date of the order directing the representation election petitioner continued to bargain with NBPW and on September 18, five days before the election, entered into a temporary agreement giving immediate effect to a wage increase. And, the negotiations and temporary agreement were publicized by petitioner through the medium of the letters it sent each employee at the St. Louis plant.

We have had occasion to point out that where a real question of representation exists an employer's duty to observe strict neutrality in matters relating to the employees' choice of bargaining representative precludes his bargaining with one of the rival labor organizations. Thus, in N. L. R. B. v. Indianapolis Newspapers, Inc., 7 Cir., 210 F.2d 501, 503, although we found no unfair labor practice because of absence of a real question of representation at the time the employer recognized one of the rivals, we observed:

"The Act forbids interference by an employer with the rights of his employees to bargain collectively, and, for that purpose, to select their own bargaining representative. When two unions are vieing [sic] for majority support of his employees, an employer must, of course, maintain a position of strict neutrality. He must refrain from any action which tends to give either an advantage over its rival; he may do nothing which tends to coerce his employees to join or to refrain from joining a particular union. Recognition of one competitor as bargaining agent during this contest period, absent proof of majority support, is a proscribed act. See, e. g., Harrison Sheet Steel Co. v. N. L. R. B., 7 Cir., 194 F.2d 407, 410; N. L. R. B. v. Faultless Caster Corp., 7 Cir., 135 F.2d 559; Elastic Stop Nut Corp. v. N. L. R. B., 8 Cir., 142 F.2d 371, 375–376, certiorari denied 323 U.S. 722, 65 S.Ct. 55, 89 L.Ed. 580."

See also: N. L. R. B. v. National Container Corp., 2 Cir., 211 F.2d 525, 536; Ohio Ferro-Alloys Corp. v. N. L. R. B., 6 Cir., 213 F.2d 646, 650–651.

■■ The fact that NBPW was the incumbent union and had been certified some five years earlier did not exempt petitioner from its duty of neutrality once a real question of representation arose. If anything said in N. L. R. B. v. Wheland Company, 6 Cir., 271 F.2d 122, relied upon by petitioner, may be taken as indicating otherwise we are not disposed to follow it. And, where the Board, after its investigation, orders a representation election we are of the opinion that absent a clear showing of majority representation by evidence of substantial nature a real question of representation must be said to exist. Petitioner made no showing that NBPW represented a majority. In Wheland, relied upon by petitioner, it was found that a clear showing of majority representation was made and the bargaining and interim agreement occurred in the absence of an order of the Board requiring a representation election to be held. The petitioner urges, however, that because at the time the temporary agreement of September 18 was executed with NBPW no St. Louis unit employee had revoked his dues checkoff authorization, and about 97% of these employees had authorized petitioner to deduct union dues, NBPW is shown to have maintained its status of majority representative. We do not regard such evidence as persuasive. There are many reasons why an employee might not revoke a previously

executed dues checkoff authorization on behalf of one union pending a representation election even though he preferred the other union which was seeking recognition. He may desire to remain a "union man" in the interim and retain union alliance irrespective of which union wins the election. Such evidence neither serves to establish that no real question of representation exists nor does it constitute proof of majority support for NBPW.

■ Section 8(d) of the Act in defining collective bargaining duties in connection with any proposal to terminate or modify an existing collective agreement provides that certain specified duties become inapplicable in case of a superseding certification by the Board as to representation. Petitioner points to the provision under which a Board certification has the effect of making inapplicable the particular duties otherwise imposed as demonstrating an employer's right, if not absolute duty, to bargain with an incumbent in those situations where the Board has ordered an election until such time as another representative has attained Board certification. We do not so read the statute. The termination or modification of an existing contract normally involves the signatory labor organization. In any event, exemption from collective bargaining duties concerning such a contract upon a Board certification of a different representative does not import that in cases involving a real question of representation an incumbent is to be bargained with, as a matter of either right or duty, until a Board certification intervenes.

■ Petitioner's contention that the interest of industrial peace should here outweigh employee freedom of choice overlooks the fact that the primary objective of the Act, "stability of labor relations",[6] includes the protection of employees against inroads into their freedom to choose a bargaining representative and that in the instant case preservation of the St. Louis employees' freedom of choice involved only that this unit be omitted from the current negotiations and bargaining until these employees had the opportunity to register a free choice at the polls. The fact that this unit had been grouped with others for bargaining purposes does not diminish the right of the St. Louis employees to change their bargaining representative at an appropriate time. The convenience of multi-unit bargaining and master contracts does not warrant infringement upon the rights of employees freely to choose their representative. Nor does the supplement to the master agreement which would eliminate the unit from the master agreement in case of board certification of a different union serve to justify petitioner's actions. Those actions tended to preclude the certification of another union. The assistance implicit in petitioner's continued bargaining and the attendant wage increase is not remedied by its agreement to abide the result of employee choice of a different union if such result occurs in spite of petitioner's assistance to the incumbent.

Actions speak louder than mere words. And petitioner's statement to the employees assuring them of their freedom to vote their preference and that petitioner would bargain with any union that was certified is no defense here. Nor does the fact that NBPW won the election, after being improperly assisted, demonstrate that no real question of representation had existed.

■ Under the facts and circumstances here involved we are of the opinion that the remedy the board fashioned is within its authority and appropriate. N. L. R. B. v. District 50, U.M.W., 355 U.S. 453, 78 S.Ct. 386, 2 L.Ed.2d 401. North Electric Co., 129 NLRB No. 78, relied upon by petitioner, is not controlling here. In that case the contract was executed before the Board ordered an election. Equally inapposite is Aiello Dairy Farms, 110 NLRB 1365 where the union's position with respect to the ex-

6. Colgate-Palmolive-Peet Co. v. N. L. R. B., 338 U.S. 355, 362, 70 S.Ct. 166, 94 L.Ed. 161.

istence of a question concerning representation was inconsistent and the Board reasoned that sound administrative practice would not permit the union to utilize an unfair labor practice charge as a method of establishing its status as a bargaining representative which it had been unable to establish by election.

The order of the Board is affirmed and the Board's petition for a decree enforcing its order is granted.

Affirmed and enforcement ordered.